[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Duke Energy Ohio, Inc., for Approval of its Fourth Amended Corporate Separation Plan,* Slip Opinion No. 2016-Ohio-7535.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.


SLIP OPINION NO. 2016-OHIO-7535

IN RE APPLICATION OF DUKE ENERGY OHIO, INC., FOR APPROVAL OF ITS FOURTH AMENDED CORPORATE SEPARATION PLAN UNDER R.C. 4928.17 AND OHIO ADM.CODE 4901:11-37; INTERSTATE GAS SUPPLY, INC., APPELLANT; PUBLIC UTILITIES COMMISSION ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Duke Energy Ohio, Inc., for Approval of its Fourth Amended Corporate Separation Plan,* Slip Opinion No. 2016-Ohio-7535.]

*Public utilities—R.C. 4928.17—Application to amend corporate separation plan—Public Utilities Commission violated R.C. 4903.09 by failing to sufficiently explain basis for its decision approving application— Commission's orders reversed and cause remanded.*

(No. 2014-1651—Submitted August 16, 2016—Decided November 1, 2016.)

APPEAL from the Public Utilities Commission, Nos. 14-689-EL-UNC and 14-690-EL-ATA.

_____

**O'NEILL, J.**

{¶ 1} Interstate Gas Supply, Inc. ("IGS"), a provider of competitive retail electric service, appeals as of right from orders of the Public Utilities Commission of Ohio authorizing Duke Energy Ohio, Inc. ("Duke"), to amend its corporate separation plan, thereby allowing Duke to engage in a new line of business: the offering of various nonelectric products and services to its customers. IGS claims that the commission's orders violate R.C. 4928.17, Ohio's corporate-separation-plan statute, and R.C. 4903.09, a general statute requiring the commission to file written opinions "setting forth the reasons prompting the decisions arrived at" in all contested cases.

{¶ 2} We agree with IGS that the commission violated R.C. 4903.09 by failing to sufficiently explain the basis for its decision. Accordingly, we reverse the commission's orders and remand this case to the commission for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. History of deregulation and corporate separation

{¶ 3} In 1999, the General Assembly restructured Ohio's electric-utility industry to foster retail competition in the generation component of electric service. Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962. As we have repeatedly recognized, the legislature "altered the traditional rate-based regulation of electric utilities by requiring the three components of electric service—generation, transmission, and distribution—to be separated." *Indus. Energy Users–Ohio v. Pub. Util. Comm.*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 5; *see, e.g., Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 52. Electric generation became an unregulated, competitive retail electric service, while electric distribution remained a regulated, noncompetitive service. *Indus. Energy Users–Ohio* at ¶ 6.

Electric utilities were required to unbundle the three components so that customers could evaluate offers from competitive generators.

> Unbundling of the service components also ensured that an electric utility would not subsidize the competitive generation portion of its business by allocating generation expenses to the regulated distribution service provided by the utility. Conversely, it ensured that distribution service would not subsidize the generation portion of the business. In short, each service component was required to stand on its own.

*Migden–Ostrander v. Pub. Util. Comm.*, 102 Ohio St.3d 451, 2004-Ohio-3924, 812 N.E.2d 955, ¶ 4.

{¶ 4} To that end, the General Assembly also prohibited electric utility companies from engaging in the businesses of supplying both noncompetitive and competitive retail electric service (e.g., distribution and generation)—or from engaging in the businesses of supplying noncompetitive retail electric service (e.g., distribution) and offering a nonelectric product or service—unless the utility implemented and operated under a commission-approved "corporate separation plan." R.C. 4928.17(A). A utility's corporate separation plan must provide, at a minimum, that the utility offer any competitive retail electric service or any nonelectric product or service "through a fully separated affiliate of the utility," R.C. 4928.17(A)(1), unless the commission approves an alternative "functional" corporate separation plan under R.C. 4928.17(C), as explained more fully below.

**B. The commission's approval of Duke's fourth amended corporate separation plan**

{¶ 5} The commission first approved a corporate separation plan for Cincinnati Gas & Electric Company, now known as Duke Energy Ohio, Inc., in

August 2000. Over the next 11 years, the commission approved a series of amendments to the plan, mostly involving Duke's initial requests to maintain— and its eventual transfer of—its competitive generation assets.

{¶ 6} In April 2014, Duke filed an application for approval of a fourth amended corporate separation plan, which, among other things, sought commission approval to commence offering nonelectric products and services to its customers.[1] Duke's proposed new business included such varied services as installing and performing maintenance on customer equipment, performing assessments of outage or voltage problems, making a generator available during construction, offering whole-house surge protection, and providing energy-consumption-analysis reports.

{¶ 7} IGS objected to Duke's application, arguing that Ohio's corporate-separation-plan statute required Duke to offer competitive services through a fully separated affiliate. Therefore, IGS argued that Duke—a regulated distribution utility—should not be permitted to offer products or services that were otherwise available in the marketplace from competitive suppliers.

{¶ 8} In June 2014, the commission approved Duke's application, although the commission also imposed a series of conditions on the utility, including conditions to prevent anticompetitive subsidies from flowing between Duke's regulated and unregulated businesses. After the commission denied IGS's application for rehearing, IGS appealed to this court, and we granted Duke's motion for leave to intervene as an appellee.

## II. STANDARD OF REVIEW

{¶ 9} "R.C. 4903.13 provides that a [commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record,

---

[1] The parties use a number of additional terms to describe these new offerings, including "special customer services," "electric-related products or services," "products or services other than retail electric service," and "unregulated noncommodity services." For the sake of consistency, we refer to Duke's proposed new business as the offering of "nonelectric products and services."

the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. The court will not reverse or modify a commission decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The court, however, has " 'complete and independent power of review as to all questions of law' in appeals from the commission." *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 121 Ohio St.3d 362, 2009-Ohio-604, 904 N.E.2d 853, ¶ 13, quoting *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997).

### III. LAW AND ANALYSIS

#### A. The relevant statutory framework

{¶ 10} Two statutes are relevant to this case: R.C. 4928.17 and 4903.09.

##### 1. *R.C. 4928.17: the corporate-separation-plan statute*

{¶ 11} The parties disagree about how to interpret R.C. 4928.17(A), (C), and (D), and they also dispute which of those divisions of R.C. 4928.17—if any—the commission relied on in reaching its decision. R.C. 4928.17(A) sets forth the general rules for corporate separation plans and requires that beginning January 1, 2001,

> no electric utility shall engage in this state, either directly or through an affiliate, in the businesses of supplying a noncompetitive retail electric service and supplying a competitive retail electric service, or in the businesses of supplying a noncompetitive retail electric service and supplying a product or

service other than retail electric service, unless the utility implements and operates under a corporate separation plan that is approved by the public utilities commission under this section, is consistent with the policy specified in section 4928.02 of the Revised Code, and achieves all of the following:

(1) The plan provides, at minimum, for the provision of the competitive retail electric service or the nonelectric product or service through a fully separated affiliate of the utility * * *.

{¶ 12} Thus, R.C. 4928.17(A) prohibits an electric utility from engaging in the businesses of supplying noncompetitive retail electric service *and* either supplying competitive retail electric service or offering nonelectric products and services *unless* the utility operates under a commission-approved corporate separation plan. Further, that plan *must* require, at a minimum, that the utility provide any competitive retail electric service or nonelectric products and services through a fully separated affiliate.

{¶ 13} R.C. 4928.17(C), however, provides an exception:

[F]or good cause shown, the commission may issue an order approving or modifying and approving a corporate separation plan under this section that does not comply with division (A)(1) of this section but complies with such functional separation requirements as the commission authorizes to apply for an interim period prescribed in the order, upon a finding that such alternative plan will provide for ongoing compliance with the policy specified in section 4928.02 of the Revised Code.

**{¶ 14}** R.C. 4928.17(C) authorizes the commission to approve an interim, alternative "functional" corporate separation plan—even if the plan does not otherwise provide for the separation of the utility's competitive and noncompetitive businesses—as long as the commission makes certain findings, including "good cause."

**{¶ 15}** Finally, R.C. 4928.17(D) addresses requests to amend a corporate separation plan:

> Any party may seek an amendment to a corporate separation plan approved under this section, and the commission, pursuant to a request from any party or on its own initiative, may order as it considers necessary the filing of an amended corporate separation plan to reflect changed circumstances.

*2. R.C. 4903.09: the reasoning-statement-requirement statute*

**{¶ 16}** R.C. 4903.09 applies to all contested commission cases and requires the commission to file "findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact." As we have previously explained, "[t]he purpose of R.C. 4903.09 is to provide the court with sufficient details to enable it to determine how the commission reached its decision." *Allnet Communications Servs., Inc. v. Pub. Util. Comm.*, 70 Ohio St.3d 202, 209, 638 N.E.2d 516 (1994).

**B. Summary of the parties' arguments**

**{¶ 17}** IGS primarily argues that the commission's orders violate R.C. 4928.17(A) because the commission authorized Duke—rather than one of its affiliates—to engage in the unregulated, competitive business of selling nonelectric products or services without otherwise approving Duke's plan as an

alternative functional corporate separation plan under R.C. 4928.17(C).[2]  Further, IGS asserts that even if the commission had approved Duke's application under R.C. 4928.17(C), the record did not establish that Duke met the statutory conditions for a functional corporate separation plan.  Finally, IGS argues that the commission's orders also violate R.C. 4903.09, because the commission failed to sufficiently explain how Duke's amended plan complied with the corporate-separation-plan requirements in R.C. 4928.17(A) or (C).

{¶ 18} In response, the commission and Duke primarily argue that the commission approved Duke's application under R.C. 4928.17(D), which concerns *amendments* to previously approved corporate separation plans.  Alternatively, the commission and Duke assert that Duke's plan also satisfied the statutory conditions for approval as a functional corporate separation plan under R.C. 4928.17(C).

### C.  The commission's orders violated R.C. 4903.09

{¶ 19} We conclude that IGS has established a violation of R.C. 4903.09.  For an appellant to prevail under that statute, the party must show at least three things:  "first, that the commission initially failed to explain a material matter; second, that [the appellant] brought that failure to the commission's attention through an application for rehearing; and third, that the commission still failed to explain itself."  *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 71.  Here, the commission failed to explain a material matter—i.e., how Duke's fourth amended corporate separation plan complied with the specific terms of R.C. 4928.17—despite numerous requests from IGS asking it to do so.

---

[2] Throughout its merit brief, IGS characterizes the authorization of an alternative functional corporate separation plan under R.C. 4928.17(C) as the granting of a "waiver" by the commission. The word "waiver," however, does not appear in R.C. 4928.17.

**{¶ 20}** Specifically, in IGS's initial objections to Duke's fourth amended plan, IGS argued that if Duke intended to engage in a new unregulated business, R.C. 4928.17(A) required that it do so through a fully separated affiliate, unless the commission approved the plan under R.C. 4928.17(C). In its finding and order, the commission acknowledged IGS's argument but did not specifically address it. The commission merely stated that there was "no substantiated reason, at this time, to find that the proposed revisions to the plan are not in compliance with state policy or the Commission's corporate separation rules."

**{¶ 21}** IGS repeated the argument in its application for rehearing. But in its rehearing entry, the commission again failed to explain how Duke's fourth amended plan actually complied with the relevant provisions in R.C. 4928.17. Instead, the commission stated:

> Contrary to the assertions of IGS * * *, our decision fully adheres with all statutory requirements. * * * We are cognizant of the requirements set forth in the statute regarding corporate separation and our approval of the application in these cases affords Duke the requisite authority needed to implement its revised corporate separation plan, subject to the requirements set forth in the Order.

**{¶ 22}** Without more explanation, the commission's reasoning is not discernible. Duke requested approval to engage in the unregulated, competitive business of selling nonelectric products and services, which is prohibited under R.C. 4928.17(A)(1) *unless* Duke offers the services through a fully separated affiliate or the commission approves an alternative functional corporate separation plan under R.C. 4928.17(C). The commission's orders summarily concluded that Duke's application is consistent with state policy and corporate-separation-plan

rules, but the commission never explained *how* Duke's fourth amended plan complied with the plain language in R.C. 4928.17(A) or (C).

**{¶ 23}** This court has long held that when "the commission has not set forth in its order its reasons in sufficient detail to enable the Supreme Court, upon appeal, to determine how the commission reached its decision, the order will be set aside." *Gen. Tel. Co. v. Pub. Util. Comm.*, 30 Ohio St.2d 271, 277, 285 N.E.2d 34 (1972); *see also Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 300, 2006-Ohio-5789, 856 N.E.2d 213, ¶ 35 ("The commission's reasoning and the factual basis supporting the modifications on rehearing must be discernible from its orders"). Given the different avenues toward compliance in R.C. 4928.17, the commission's conclusory statement that Duke's plan was "in compliance with state policy [and] the Commission's corporate separation rules" was insufficient to enable us to determine how it reached its decision.

**{¶ 24}** Further, we cannot accept appellate counsel's post hoc rationalizations purporting to explain why Duke's amended plan complied with R.C. 4928.17(C) or (D). In their filings in this court, counsel for the commission and for Duke primarily argue that the commission approved Duke's application under R.C. 4928.17(D), which they argue gives the commission broad latitude to approve any amendment to a previously approved corporate separation plan. But the commission's underlying orders failed to cite R.C. 4928.17(D)—let alone to identify that provision as authority for its decision. Waiting until appellate briefing to explain the basis or authority for a commission decision does not satisfy R.C. 4903.09. Indeed, the United States Supreme Court has noted that it typically "will not uphold a discretionary agency decision where the agency has offered a justification in court different from what it provided in its opinion." *Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty., Washington*, 554 U.S. 527, 544, 128 S.Ct. 2733, 171 L.Ed.2d 607 (2008). If the commission approved Duke's application under R.C. 4928.17(D), it should have

said so in its orders and should have explained how that specific provision authorized Duke's amended plan.

{¶ 25} Similarly, the commission's orders do not indicate that it made the necessary findings for approval of Duke's application as an alternative functional corporate separation plan under R.C. 4928.17(C). For example, the commission argues on appeal that "good cause" existed to approve Duke's amended plan under R.C. 4928.17(C) because the commission imposed conditions that defined the parameters by which Duke could offer the new nonelectric products and services. But nowhere in the commission's orders does it identify those conditions as the "good cause" for approving a "functional" corporate separation plan.

{¶ 26} Additionally, the commission argues in its brief that Duke's plan was approved on an "interim" basis and that it is not permanent because it "is subject to termination by the Commission, at any time, for any misstep." The word "interim" is defined as "a time intervening," "a provisional decision or arrangement," or "in the meantime." *Webster's Third New International Dictionary* 1179 (1993). The commission's orders essentially authorize Duke to sell nonelectric products and services indefinitely, as long as Duke complies with the conditions imposed in the commission's orders. Under any definition, that is not an "interim" corporate separation plan. We do not accept the commission's counsel's attempt to recast the commission's decision to be something that it is not. If the commission approved Duke's amended plan under R.C. 4928.17(C), the commission should have made the necessary findings required by that provision.

### D. The appropriate remedy

{¶ 27} As a remedy, IGS requests that we instruct the commission to order Duke to amend its corporate separation plan to require that it provide any nonelectric products or services through a fully separated affiliate. Although we

are admittedly skeptical as to how the commission could approve Duke's amended plan under R.C. 4928.17(C) or (D) based on the record before us, we are also cognizant that the General Assembly has given the commission substantial discretion in approving an alternative functional corporate separation plan or an amended corporate separation plan under those provisions. *See, e.g.*, *Ohio Consumers' Counsel*, 111 Ohio St.3d 300, 2006-Ohio-5789, 856 N.E.2d 213, at ¶ 72, quoting R.C. 4928.17(C) ("The commission has discretion to approve an alternative functional corporate separation plan for an interim period upon a determination of 'good cause' "); *id.* at ¶ 74 ("Under R.C. 4928.17(C), the commission's discretion is limited only by the 'good cause' standard and the requirement that the commission find that 'such alternative plan will provide for ongoing compliance with the policy specified in' R.C. 4928.02").

{¶ 28} Given that discretion, we are reluctant to resolve the meaning of disputed language in R.C. 4928.17(C) or (D) or to make findings under those provisions when the provisions were not first addressed by the commission in the proceedings below—especially considering our history of relying on the agency's administrative construction of its own statutes. Accordingly, remanding this case to the commission with instructions to fully explain the basis for its decisions under the relevant provisions of R.C. 4928.17 is the appropriate remedy.

## IV. CONCLUSION

{¶ 29} For the reasons explained above, the commission violated R.C. 4903.09. We reverse, and we remand this case to the commission with instructions to fully address IGS's statutory arguments, to issue findings that thoroughly explain how—if at all—Duke's application complies with the specific relevant provisions in R.C. 4928.17, and to identify the evidence that the commission considered to support its decision.

Orders reversed

and cause remanded.

O'CONNOR, C.J., and LANZINGER and FRENCH, JJ., concur.

O'DONNELL, J., concurs in part and dissents in part, with an opinion.

KENNEDY, J., concurs in part and dissents in part, with an opinion joined by PFEIFER, J.

_____

**O'DONNELL, J., concurring in part and dissenting in part.**

{¶ 30} Although I concur in the majority's determination that the Public Utilities Commission of Ohio violated R.C. 4903.09 by failing to sufficiently explain the basis for its decision, I dissent from the decision to remand this case to the commission. I would adhere to the Public Utilities Commission's obligation to set forth the reasons for its decisions and to comply with the corporate separation plan statute by permitting Duke Energy Ohio, Inc. ("Duke") to offer nonelectric products or services to its customers only through a fully separated affiliate.

{¶ 31} R.C. 4928.17(A) states in pertinent part:

[N]o electric utility shall engage in this state, either directly or through an affiliate, * * * in the businesses of supplying a noncompetitive retail electric service and supplying a product or service other than retail electric service, unless the utility implements and operates under a corporate separation plan that is approved by the public utilities commission under this section * * * and achieves all of the following:

(1) The plan provides, at minimum, for the provision of * * * the nonelectric product or service through a fully separated affiliate of the utility * * *.

{¶ 32} In accordance with the statute, I would issue an order directing Duke to amend its corporate separation plan to require that it provide nonelectric products or services to its customers through a fully separated affiliate of the utility.

_____

**KENNEDY, J., concurring in part and dissenting in part.**

{¶ 33} The orders of the Public Utilities Commission of Ohio ("commission") authorizing Duke Energy Ohio, Inc. ("Duke"), to amend its corporate separation plan to permit Duke to engage in a new line of business—the offering of various nonelectric products and services to its customers—violate R.C. 4928.17, Ohio's corporate-separation-plan statute, and the public policy announced by the General Assembly in R.C. 4928.02. Although I agree with the majority that the commission's orders cannot be affirmed, I disagree with the majority's reasoning and with the terms of the majority's remand to the commission. Therefore, I respectfully dissent in part.

{¶ 34} The wording of R.C. 4928.17(C) makes clear that the intention of the General Assembly, as codified in the statutes at issue in this case, was to aid an incumbent electric utility in phasing in the requirements of electricity deregulation by providing a process for unbundling competitive and noncompetitive retail electric services over a period of time. It was not the intention of the General Assembly to permit a business that supplies noncompetitive retail electric services to, in effect, "rebundle" in order to provide new nonelectric products and services that are required to be offered through a fully separate affiliate. Accordingly, I would reverse the commission's orders and remand the case to the commission with instructions to proceed in a manner consistent with the reasoning stated in this opinion.

{¶ 35} In 2011, the commission allowed Duke to amend its "functional" corporate separation plan so that it could have until the end of 2014 to transfer its

generating assets. The commission noted in that order that when Duke finally transferred its generating assets, it would achieve "full legal corporate separation." *In re Application of Duke Energy Ohio, Inc., for Auth. to Establish a Standard Serv. Offer Pursuant to Section 4928.143, Revised Code, in the Form of an Elec. Sec. Plan, Accounting Modifications, & Tariffs for Generation Serv.*, Pub. Util. Comm. Nos. 11-3549-EL-SSO, 11-3550-EL-ATA, and 11-3551-EL-UNC, at 45 (Nov. 22, 2011). Nevertheless, in April 2014, Duke filed an application for approval of a fourth amended corporate separation plan, seeking to, among other things, engage in a potential new line of business: the provision of nonelectric products and services. At issue in this case is whether the commission is authorized, pursuant to R.C. 4928.02 and 4928.17, to issue an order approving Duke's amendment to its corporate separation plan to allow Duke to begin rebundling services by offering various nonelectric products and services to its customers.

{¶ 36} "The ultimate inquiry in the interpretation of statutes is to ascertain the legislative intent." *Caldwell v. State*, 115 Ohio St. 458, 466, 154 N.E. 792 (1926). One of the cardinal rules of statutory construction is that we must first examine the language of the statute itself. *Provident Bank v. Wood*, 36 Ohio St.2d 101, 105, 304 N.E.2d 378 (1973). " '[I]f the words [are] free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the lawmaking body, there is no occasion to resort to other means of interpretation.' " *Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 12, quoting *Slingluff v. Weaver*, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph two of the syllabus. The court must give effect to the words used, making neither additions nor deletions from words chosen by the General Assembly. *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 19, citing *Cline v. Ohio Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 97, 573 N.E.2d 77 (1991).

{¶ 37} " '[T]he General Assembly is not presumed to do a vain or useless thing, and * * * when language is inserted in a statute it is inserted to accomplish some definite purpose.' " *State v. Wilson*, 77 Ohio St.3d 334, 336, 673 N.E.2d 1347 (1997), quoting *State ex rel. Cleveland Elec. Illum. Co. v. Euclid*, 169 Ohio St. 476, 479, 159 N.E.2d 756 (1959). When reviewing a statute, we cannot " 'pick out one sentence and disassociate it from the context,' " but we instead must look at " 'the four corners of the enactment' " to determine the intent of the legislature. *MacDonald v. Bernard*, 1 Ohio St.3d 85, 89, 438 N.E.2d 410 (1982), quoting *Black-Clawson Co. v. Evatt*, 139 Ohio St. 100, 104, 38 N.E.2d 403 (1941).

{¶ 38} R.C. 4928.02 and 4928.17 were enacted by the General Assembly in 1999 in Am.Sub.S.B. No. 3 ("S.B. 3"), 148 Ohio Laws, Part IV, 7962; *id.* at 7998-7999, 8018-8020. S.B. 3 "restructured Ohio's electric-utility industry to foster retail competition in the generation component of electric service." *Indus. Energy Users–Ohio v. Pub. Util. Comm.*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 5. It also "altered the traditional rate-based regulation of electric utilities by requiring the three components of electric service—generation, transmission, and distribution—to be separated." *Id.*, citing *Migden–Ostrander v. Pub. Util. Comm.*, 102 Ohio St.3d 451, 2004-Ohio-3924, 812 N.E.2d 955, ¶ 3-4.

{¶ 39} R.C. 4928.17(A) mandates that unless an electric utility operates under a corporate separation plan ("plan") approved by the commission, the utility is prohibited from engaging in the business of supplying noncompetitive electric service and supplying either competitive retail electric service or a product or service other than electric service. R.C. 4928.17(A) states that the plan must be "consistent with the policy specified in" R.C. 4928.02. The plan also must "provide[], at minimum, for the provision of the competitive retail electric service or the nonelectric product or service through a fully separated affiliate of the utility * * *." R.C. 4928.17(A)(1). Accordingly, the General Assembly

16

expressed the intent that a noncompetitive electric utility was to be solely in the business of supplying regulated distribution service.

{¶ 40} R.C. 4928.17(C) provides that the commission is able to approve (or to modify and approve) a plan upon finding both "that the plan reasonably complies with the requirements of division (A) of this section and will provide for ongoing compliance with the policy specified in" R.C. 4928.02. However, when a plan does not comply with R.C. 4928.17(A)(1), for good cause shown, the commission may issue an order approving (or modifying and approving) the plan if the plan

> complies with such functional separation requirements as the commission authorizes to apply for an interim period prescribed in the order, upon a finding that such alternative plan will provide for ongoing compliance with the policy specified in section 4928.02 of the Revised Code.

R.C. 4928.17(C).

{¶ 41} The majority states that R.C. 4928.17(C) sets forth an "exception" to R.C. 4928.17(A), majority opinion at ¶ 13, but the majority's approach does not adequately appreciate the substantial limitations that are inherent in R.C. 4928.17(C). In enacting R.C. 4928.17(C), the General Assembly recognized that the process of unbundling the three components of electric service and achieving compliance with R.C. 4928.17(A) would take time. Accordingly, the statutory language used by the General Assembly reveals that R.C. 4928.17(C) provides for temporary noncompliance with R.C. 4928.17(A) only while the utility works toward full compliance with R.C. 4928.17(A). This is not a broad exception to R.C. 4928.17(A); it is a narrow authorization to deviate in a very limited way from the requirements of that provision.

**{¶ 42}** In R.C. 4928.17(A), the General Assembly set forth the exceptions to the requirements of that statute. Specifically, R.C. 4928.17(A) begins, "Except as otherwise provided in sections 4928.142 or 4928.143 or 4928.31 to 4928.40 of the Revised Code * * *." This language signals that R.C. 4928.17(A) is not absolute; it yields to those specifically listed statutes when appropriate. *See State v. Evans*, 102 Ohio St.3d 240, 2004-Ohio-2659, 809 N.E.2d 11, ¶ 15. Moreover, the use of the "[e]xcept as otherwise provided in" language in R.C. 4928.17(A) indicates that the General Assembly has deliberately chosen to qualify the application of that statute in certain situations.

**{¶ 43}** Absent from the General Assembly's explicit statement of statutes that are not subject to the requirements of R.C. 4928.17(A) is R.C. 4928.17(C). R.C. 4928.17(A) contains no express wording stating "except as otherwise provided in division (C) of this section." The absence of language of this type cannot be discounted. By failing to include R.C. 4928.17(C) among the stated exceptions, the General Assembly has chosen to provide that the requirements of R.C. 4928.17(A) should take precedence over the provisions of R.C. 4928.17(C), except in very limited circumstances. Because the General Assembly could have included R.C. 4928.17(C) in the "[e]xcept as otherwise provided in" language but did not, "we will not add" those words "by judicial fiat." *Hulsmeyer v. Hospice of Southwest Ohio, Inc.*, 142 Ohio St.3d 236, 2014-Ohio-5511, 29 N.E.3d 903, ¶ 26, citing *In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, ¶ 26 ("The court must give effect to the words used, making neither additions nor deletions from words chosen by the General Assembly. * * * Certainly, had the General Assembly intended to require that electric-distribution utilities prove that carrying costs were 'necessary' before they could be recovered, it would have chosen words to that effect").

**{¶ 44}** The language used by the General Assembly in R.C. 4928.17(C) reinforces this conclusion. The authority granted to the commission in R.C.

4928.17(C) to issue an order approving a plan that does not comply with R.C. 4928.17(A)(1) is qualified and extremely narrow. As relevant here, the plan must comply with such functional separation requirements as the commission authorizes to apply for an interim period only, and the plan must provide for ongoing compliance with the policy specified in R.C. 4928.02.

{¶ 45} The General Assembly's insertion of "interim" in R.C. 4928.17(C) was purposeful and must be given effect. *See Wilson*, 77 Ohio St.3d at 336, 673 N.E.2d 1347. "Interim" is defined as "a provisional decision or arrangement." *Webster's Third New International Dictionary* 1179 (1993). By using "interim," the General Assembly expressed its intent that an order issued pursuant to R.C. 4928.17(C) must be of a temporary, limited nature, to exist only during the period when the incumbent electric utility is working through the process of unbundling noncompetitive and competitive retail electric services in order to achieve full compliance with R.C. 4928.17(A).

{¶ 46} Accordingly, R.C. 4928.17(C) does not permit a utility supplying a noncompetitive retail electric service to modify an approved plan in order to provide new nonelectric products and services with no intention of supplying the products and services through a fully separated affiliate of the utility. To find otherwise fails to give effect to the General Assembly's choice of the word "interim" in R.C. 4928.17(C) and allows the temporary reprieve permitting noncompliance to become so large that it swallows the rule set forth in R.C. 4928.17(A).

{¶ 47} Further, the requirement in R.C. 4928.17(C) that an "alternative plan * * * provide for ongoing compliance with the policy" stated in R.C. 4928.02 supports the interpretation that R.C. 4928.17(C) merely allows for temporary noncompliance with R.C. 4928.17(A) to assist the utility during the phase-in period of deregulation. R.C. 4928.02 provides in relevant part:

It is the policy of this state to do the following throughout this state:

＊ ＊ ＊

(B) Ensure the availability of unbundled and comparable retail electric service that provides consumers with the supplier, price, terms, conditions, and quality options they elect to meet their respective needs;

＊ ＊ ＊

(H) Ensure effective competition in the provision of retail electric service by avoiding anticompetitive subsidies flowing from a noncompetitive retail electric service to a competitive retail electric service or to a product or service other than retail electric service, and vice versa, including by prohibiting the recovery of any generation-related costs through distribution or transmission rates[.]

{¶ 48} Therefore, any order issued pursuant to R.C. 4928.17(C) must be in harmony with these policies, working toward the ultimate goal of deregulation. To conclude that R.C. 4928.17(C) authorizes the commission to approve an order that permits Duke, a noncompetitive utility, to begin providing new nonelectric products and services is antithetical to the policies of deregulation espoused in R.C. 4928.02.

{¶ 49} The intent of the General Assembly in enacting S.B. 3 was to deregulate the electric-utility market. However, the General Assembly knew that it would take a period of time to accomplish this goal. To that end, the General Assembly provided a vehicle by which the commission could temporarily approve a plan that did not require a noncompetitive electric utility to provide a competitive retail electric service through a fully separated affiliate of the utility

while the phase-in period of deregulation was progressing.  The language of R.C. 4928.02 and 4928.17 expresses this intent.

{¶ 50} R.C. 4928.17(C) makes clear that the intention of the General Assembly was to aid an incumbent electric utility through the deregulation phase-in period by providing a process for unbundling competitive and noncompetitive retail electric services over a limited amount of time.  It was not the intention of the General Assembly to permit a business that supplies noncompetitive retail electric services the opportunity to rebundle in order to provide new nonelectric products and services that are required to be offered through a fully separate affiliate.  Therefore, I would reverse the orders of the commission and remand this case to the commission with instructions to proceed in a manner consistent with this opinion.

{¶ 51} Accordingly, I dissent in part.

PFEIFER, J., concurs in the foregoing opinion.

_____

Joseph Oliker and Matthew White, for appellant.

Michael DeWine, Attorney General, William L. Wright, Section Chief, and Thomas W. McNamee and Steven L. Beeler, Assistant Attorneys General, for appellee, Public Utilities Commission of Ohio.

Amy B. Spiller and Jeanne W. Kingery, for intervening appellee, Duke Energy Ohio, Inc.

_____